

# THE ATTORNEY GENERAL
## OF TEXAS

GERALD C. MANN  
XX~~XXXXXX XXXXXXX~~N  
ATTORNEY GENERAL.

AUSTIN 11, TEXAS

Honorable George H. Sheppard  
Comptroller of Public Accounts  
Austin, Texas

Dear Sir:

Opinion No. 0-4025  
Re: Gas Production Tax Claim  
against Canadian River Gas  
Company - determination of  
"market value" of natural  
gas under Article 7047b,  
prior to May 1, 1941.

We are in receipt of your letter of September 23, 1941, which reads as follows:

"We have recently made an investigation of the books and records of the Canadian River Gas Company. This company is the producer of gas which supplies through affiliates the gas used in Amarillo and Dalhart, Texas; Denver and Colorado Springs, Colorado; and, one-fourth of the requirements of the line to Chicago.

"Reports to this office for the month of July 1941 show that eighty-nine per cent of all gas handled by pipelines in the Panhandle area was exported from Texas to other States; and that the owners of the pipelines produced eighty-four per cent of all gas carried by said pipelines, buying only sixteen per cent of their requirements from other producers.

"This compnay admits a probable liability under Method I of about $28,000 without penalty and interest.

"I am attaching copy of auditor's report for your study and consideration. Please refer to your Opinion No. 0-633 dated April 26, 1939 and advise me as to your opinion of the correct method to use in determining this company's liability under Article 7047b prior to May 1, 1941; also, the correct method to use under this law as amended by House Bill No. 8."

Under the facts presented in this letter together with the report of Mr. J. Nelson Brown attached thereto, you ask us the following

question:

What is the correct method to use in determining this company's liability under Article 7047b prior to May 1, 1941; also, the correct method to use under this law as amended by House Bill No. 8?

Since receiving your letter of September 23 above set out, we have released Opinion No. 0-3516 addressed to you written by Mr. Cecil C. Rotsch, October 16, 1941, wherein the determination of market value of natural gas under Article II of House Bill 8 as enacted by the 47th Legislature, 1941, being Article 7047b, as amended, is discussed at length. The writer is advised by Mr. Nelson Brown of your department that this opinion answers the question submitted by your letter above set forth with reference to the correct method to use in determining the liability of the Canadian River Gas Company subsequent to May 1, 1941, under House Bill No. 8, above mentioned. Therefore, this opinion will be confined to the correct method to use in determining the liability of Canadian River Gas Company prior to May 1, 1941.

The material part of the statute in question, which is House Bill 547, Chapter 73, page 111, Acts 1931, 42nd Legislature, amended by House Bill 8, Chapter 495, page 2040, Acts 1936, 3rd Called Session, 44th Legislature, all of which prior to its amendment by Article II of House Bill 8 as enacted by the 47th Legislature, was codified as Article 7047b of Vernon's Annotated Civil Statutes of Texas, reads as follows:

"Sec. 1 (a) That from and after the date herein fixed, every person engaging or continuing within this State, in the business of producing and saving in paying quantities, for sale or for profit, any natural gas, including casinghead gas, from the soil or waters of this State, and

"(b) Every person who imports natural gas into this State and thereafter sells the same in intrastate commerce in this State, the tax to be imposed on the first sale; (provided, however, that if any gas is imported into this State from another state, in which latter State a severance, occupation or excise tax is imposed, the person importing such gas shall not be required to pay another tax thereon under the provisions of this Act),

"(c) Are hereby declared to be 'producers' and engaged in the business of producing natural gas within this State and shall make quarterly on the 25th day of January, April, July and October each year, a report to the Comptroller, . . . ."

"Sec. 3. A tax shall be paid by each such producer
on the amount of gas produced and saved within this State,
and on gas imported into the State, upon the first sale there-
of in intrastate commerce upon the following basis:

"A tax equivalent to three per cent (3%) of the market
value of the total amount of gas produced and saved within
this State, or sold, if imported into this State, at the actual
market value thereof, as and when produced. . . ."

On April 26, 1939, we released Opinion No. 0-633 addressed to
you and written by Cecil Rotsch, a member of this department, wherein we
discussed the "place where market value should be determined in taxing na-
tural gas under Article 7047b" prior to its amendment by the 47th Legislature.
We held in this opinion that the tax levied by Article 7047b was a "severance
tax". We quote from said opinion as follows:

"We believe that this tax is what is sometimes referred
to as a 'severance tax,' and if that is true it is reasonable to
believe that the legislature intended to charge the tax immediately
upon the gas being severed from the earth. The Louisiana Natural
gas tax act, which is almost identical with the Texas statute we
are considering, was held to be a 'severance tax' in the case of
Gulf Refining Co. v. McFarland, 154 La. 251, 97 Sou. 433. In 57
Corpus Juris 538 'severance tax' is defined as follows:

" 'Severance tax. An excise tax upon the privilege of
severing, or upon the right to sever the natural resources
from the soil; a tax upon the natural resources from the soil.'

"We should look at this tax from a practical stand-
point, and see how it operates. If we charge this tax on
the basis of the higher market value at the place of sale
seven miles away instead of on the basis of the lower
market value at the well, then all the operator has to do
in order to escape the higher tax would be to sell and con-
vey its 'compressor stations' and seven mile pipe line to
another concern, and sell its gas to this other concern at
3 cents at the mouth of the well, and let this other concern
compress the gas and transport it seven miles and resell
it at $3\frac{1}{2}$ cents. The legislature is presumed to have known
the actual conditions the act was to apply to when it passed
it; and it intended for the law to operate in a practical
manner. We think it intended for the tax to be paid on the
basis of the market value at the well."

Further quoting from Opinion No. 0-633:

"Usually the price paid by the purchasing pipe line company is a proper criterion on which to figure market value, but it could be a producer and a purchaser would enter into a contract for a price less than the market value or more than the market value for reasons known only to themselves, and such a price in those cases should not be taken by the Comptroller as market value. He should be governed by 'the actual market value,' which may change from time to time.

"Our answer to your inquiry is that under the facts of the case in question you should charge the natural gas tax, provided for in Article 7047-b, on the basis of the actual market value at the well, and not on the basis of the actual market value at the place of the first sale if that place is away from the well; and you are advised that if the gas has no market value at the well you may determine its market value at the well by taking the actual market value where there is a market and deducting the cost of taking the gas to that market.

We believe that this opinion, which we expressly approve, fully answers the question submitted by you. You will note that in the last four lines of the above quotation from the opinion we advise you as follows: "and you are advised that if the gas has no market value at the well you may determine its market value at the well by taking the actual market value where there is a market and deducting the cost of taking the gas to that market."

We believe from the facts set forth in your letter and the attached report of Mr. Brown that acting under this opinion method six as set forth on page 2 of the report of Mr. Brown would be the proper method to follow in determining the tax liability of Canadian River Gas Company under Article 7047b prior to May 1, 1941, however we will discuss the proposition further.

As we understand the report sent to us by Mr. Brown, Canadian River Gas Company is a part of an intricate corporate structure consisting of a maze of corporations the ownership of all of which can ultimately be traced to the same interests and these interests substantially control the production, transportation and ultimate sale of the major portion of all gas taken from the Panhandle gas field. These inter-woven corporations operate under contracts with themselves resulting in the sale of gas from the Panhandle field at prices ranging from net cost to seven or eight cents per thousand cubic fee. We further understand from Mr. Brown's report that the result of this control of the production, transportation and ultimate sale of practically all of the gas produced in the Panhandle field is that some independent well operators must sell their gas for as low as one-half cent per thousand

cubic feet by virtue of the fact that they have no market and no trans-
portation system to dispose of such gas. Assuming that these facts are
true and could be sustained to the satisfaction of a jury we are con-
strained to the belief that same would justify a finding that there is
actually no established market value at the well in this field as is
usually the case in oil and gas fields in Texas. In fact such has been
judicially determined in the case of Consolidated Gas Utilities Corpora-
tion v. Thompson and Texoma Natural Gas Company v. Thompson, re-
ported in 14 Fed. Supp. 318, wherein the court in speaking of gas pro-
duced in the Panhandle gas field for light and fuel purposes says the
following on page 324 of the opinion:

> "As to gas for these uses, there is not, there
> never has been, a real market in the field, for except
> for a small quantity consumed in operating wells and
> plants, gas for this use is not sold in the field. It is
> transported on contracts to distant points for delivery
> at the burner tips. The commission's proration order
> was therefore based not upon market demand in the field,
> but upon the amount required by plaintiffs and other pipe
> lines for supplying their customers at distant points."

Therefore in view of the facts before us and in view of this
decision, and, assuming that the fact that there is no market value for gas
at the well in the field in question can be established, we will discuss the
question presented from such standpoint.

In the case of Atchison T. & S. F. Ry. Co. v. Nation and
Slavens, 92 S. W. 823, the court of Civil Appeals sets out the rule for
determining market value where there is no market value at the particular
place in question. The following is a quotation from said case:

> "The rule is well settled that where the question
> is what was the value of property at a particular place
> and there was no market value there, proof may be given
> of such value at other places with the cost of transporta-
> tion in order to enable the jury to deduce the value at the
> place in question." Citing Sutherland on Damages (2nd
> Ed.), Section 445.

Again in the case of Kerr v. Blair, 105 S. W. 548, the court
in discussing the proposition of determing the market value of rice at a
particular place when it was shown that there was no market value at
that place says the following:

> "The above testimony would show that the
> rice was in the shock to be threshed by defendant, and
> if they failed to thresh it as they contracted to do, plain-
> tiff's damages would be measured by reference to its mark-
> et value as threshed at that place or at the nearest place
> where it had a market value. If the evidence showed it
> had a market value at Bay City, a few miles distant, it
> was sufficient to afford a basis for measuring damages."

In the case of Dale Oil & Refining Company v. the City of Tulia, 25 S. W. (2d) 671, the court in determining the market value of oil has the following to say:

"Where there has been no sale of personal property or a commodity of a given kind in the particular place involved, then its markĕt vlaue may be shown by proving such value at the nearest market and adding thereto the costs of transportation."

Having determined that there is no market value for gas at the well in the Panhandle gas field the gross receipts of the producer less the cost of getting the gas to market, whatever that ultimate market may be, seems to us to be the basis upon which to determine the market value of gas at the well for purposes of taxation under Article 7047b. Arriving at this conclusion the question is then presented whether or not the tax levied under Article 7047b would constitute a tax on property outside the State of Texas or would result in a burden on inter-state commerce and hence become repugnant to the Constitution of the United States. We do not believe that this would be the result simply because of the fact that the Comptroller in determining the market value at the well would have to ascertain the ultimate sale price of the gas in other states and the cost of its transportation thereto by virtue of the fact that a substantial portion of the gas produced is transported and ultimately sold in Northern and Eastern and in some cases Western States.

In the case of American Manufacturing Company v. City of St. Louis, 250 U. S. 459, which was a case in which the taxpayer manufactured furniture in St. Louis part of which went into storage in New York before being sold in that State. The court held that such sales in another state were exempt from the local occupation tax, and that that tax was not on sales, and that the tax did not constitute a burden on interstate commerce.

In the case of Hope Natural Gas Company v. Hall, by the Supreme Court of Appeals of West Virginia, reported in 135 S. E. 582, the court, in construing an occupation tax on among other things the production of natural gas, the statute providing:

"The meansure of this tax is the value of the entire production in this state, regardless of the place of sale or the fact that deliveries may be made to points outside the state."

held, that the sale price necessarily included the cost of delivery saying that such sale price would not reflect the worth of the commodity in the State, but the worth within the State plus the cost of transportation.

In the Hope Natural Gas Company case, supra, the court in the opinion says the following:

"In Wallace v. Hines, 253 U. S. 66, 40 Sup. Ct. 435,
(64 L. Ed. 782), the Supreme Court Said:

"'The only reason for allowing a state to look
beyond its borders when it taxes the property of foreign
corporations is that it may get the true value of the
things within it; when they are a part of an organic
system of wide extent, that gives them a value above
what they otherwise would possess. The purpose is
not to expose the heel of the system to a mortal dart --
not, in other words, to open to taxation what is not
within the state.'

"By parity of reasoning, we can as well say that
the only reason for permitting consideration of the price
plaintiff receives for delivering gas through its trans-
mission system to another state is to get the true value
of the gas within the state before it enters into inter-
state commerce, and that purpose is not to open to
taxation interstate commerce itself."

The Hope Natural Gas Company case, supra, involved a
state of facts quite similar to the facts presented in this situation, that is,
the chief business of the plaintiff in error was the production and purchase
of natural gas in West Virginia and the continuous and uninterrupted trans-
portation of this through pipelines in Pennsylvania and Ohio, where it is
sold, delivered and consumed. The corporation owned 3178 producing
wells located in 25 counties of West Virginia, from which it took in the
year ending June 30, 1925, more than twenty-five billion cubic feet of gas.
Most of this passed into interstate commerce by continuous movement
from the wells. We are confronted with practically the same situation
here. Practically all of the production of gas from the Panhandle field
is controlled by the intricate corporate structure as above set out and
a major portion of this production is transmitted through transmission
lines all controlled by the same interests to the various markets in other
states.

In the case of Cumberland Pipeline Company v. Common-
wealth, by the Court of Appeals of Kentucky, reported in 15 S. W. (2d) 280-286,
which was a case involving a license or franchise tax on those engaged in
the production of crude petroleum in the State of Kentucky which tax provided
for the payment annually of one per cent of the market value of all crude
petroleum produced and further provided in Section 1 thereof that the State
Tax Commission must find the market value from monthly reports showing
sales of such crude petroleum and from such other reports and information
as it may secure and further providing that the Commission should make an
appropriate allowance for the cost of transportation from the producing
wells to the market. It was held that the value of petroleum at the wells
should be ascertained from the evidence of the market value after the oil

had completed its journey through the channels of commerce and had been sold in the market. The following is a quotation from page 284 of the opinion in this case:

"It requires that the value at the wells should be ascertained from the evidence of the market value after the oil has completed its journey through the channels of a commerce and has been sold in the market. It is but a means adopted and prescribed to find the market value of the oil at the well where it was produced. There is seldom, if ever, a market at the place of production. The product must be carried to the markets. The value at the place of production is the selling price less the cost of transportation to the place of sale." (Underscoring ours)

While Article 7047b does not provide a method for determining market value as was provided in the Kentucky statute as above shown, we believe that such method is but the adoption of the rule of law to be used in determining the market value at a particular place when there is no market value at that place. In fact on page 284 of the opinion in the Cumberland Pipeline case, supra, the court in effect lays down this rule as follows:

"The act requires the state tax commission to resort to the same sources for evidence that would naturally and necessarily be selected to establish the fact of market value if the Act were silent upon that subject. The method is not a new one, but conforms to the legal rules of evidence for the ascertainment of market value. 22 C. J. § 151, p. 187; 35 Cyc. 638; Woerman v. McKinney-Guedry Co., 174 Ky. 521, 192 S. W. 684.

"The market value of a commodity is its selling price in the usual and ordinary course of business, but, if there be no market at a particular place at which it is desired to fix the market value, then the market value is taken at the nearest point available, with adjustments to care for the cost of transportation to that market. Campbellsville Lumber Company v. Bradlee & Wiggins, 96 Ky. 494, 29 S. W. 313; Log Mountain Coal Co. v. White Oak C. Co., 163 Ky. 842, 174 S. W. 721. The plain mandate of the act of 1918 is that the tax commission shall find the market value at the place of production by taking the actual sales as reported from the pipeline companies, and such other evidence thereof as may be available, and deducting therefrom the carriage charges. The result reached in that way is the market value of the oil at the well." (Underscoring ours)

Further quoting from the opinion in the case of Cumberland Pipeline Company v. Commonwealth, supra, on page 285 thereof, we find the following:

"In its final analysis, the tax is measured by the market value of the product at the place of production. It is quite true that the value is ascertained by taking evidence of sales in another state after the article has been carried in interstate commerce, but the use of such evidence is not forbidden. It is not put 'apart in a kind of civil sanctuary,' where the state may not venture for facts relevant and important in the administration of its tax laws. Davis v. G. C. G. & St. L. R. Co., 217 U. S. 157, 30 S. Ct. 463, 54 L. Ed. 708, 27 L. R. A. (N. S.) 823, 18 Ann. Cas. 907; Baltic Mining Co. v. Mass, 213 U. S. 68, 34 S. Ct. 15, 58 L. Ed. 127. It is not possible to find the value of mineral products at the mine where there is no market, except by taking the value at the nearest market and deducting the cost of transportation. Interstate commerce is not affected or burdened by the use thus made of evidence resulting from transactions therein. There is no basis for the contention that the tax on the producer is invalid because the amount of the investment is ascertained by considering incidents, facts, or results flowing from interstate commerce. American Mfg. Co. v. St. Louis, 250 U. S. 460, 39 S. Ct. 522, 63 L. Ed. 1084. In the Hall case, 102 W. Va. 272, 135 S. E. 582, affirmed 274 U.S. 285, 47 S. Ct. 639, 71 L. Ed. 1049, the producer and carrier of natural gas were the same corporation, and the act levied the tax at the well based on the entire porduction wherever sold. As the carrier was also the producer, the result was that the selling price corresponded closely to the gross receipts, and the act was susceptible to the construction that the gross receipts for the gas produced, including the interstate transportation, was subject to the tax. The Supreme Court of Appeals of West Virginia construed the act to exclude the cost of transportation by limiting the power to tax to the place of production. The kentucky Act of 1918 expressly required the cost of transportation to be given proper weight, and applies by its terms to the producer alone." (Underscoring ours)

Let us take by way of analogy a party in Texas who is desirous of selling a piece of antique furniture which he owns and let us assume for the purpose of this analogy that the only market for such an article is in New York City. The party in Texas is the owner of a moving van into which he places the piece of furniture and transports same to New York where it is ultimately sold. We believe that in determining the market value of this piece of furniture that same would be the ultimate sale price less the cost of transporting it to New York, taking into consideration all of the incidental costs of such transportation.

From a thorough study of the cases hereinabove referred to and the report on the operations of Canadian River Gas Company which you have submitted to us, we are of the opinion and you are therefore advised that the correct method to use in determining the tax liability of Canadian River Gas Company under Article 7047b of the Revised Civil Statutes of Texas prior to May 1, 1941, is method six as contained in the report of Mr. Brown on page 2 thereof, which method as we understand it, is as follows:

> Take the gross receipts received for the gas at its ultimate wholesale destination, that is, at the first sale, where there is an established, bona fide, market, and subtract therefrom all costs of transportation and allow in addition thereto eight per cent return on invested capital the remaining figure being the value of the gas at the well.

The eight per cent allowance above as we understand it, is an arbitrary figure set up by Mr. Brown, which he considers a reasonable return on the investment, but, of course, whether same is reasonable or not would be a matter for judicial determination.

Trusting that the foregoing fully answers your inquiry, we are

Yours very truly

ATTORNEY GENERAL OF TEXAS

By

Douglas E. Bergman
Assistant

DEB:db:ps